[L.A. No. 29524. In Bank. June 6, 1968.]

STEWART DAVID BURTON et al., Petitioners, v. MUNICIPAL COURT OF THE LOS ANGELES JUDICIAL DISTRICT OF LOS ANGELES COUNTY, Respondent; THE PEOPLE, Real Party in Interest.

* Assigned by the Chairman of the Judicial Council.

Stanley Fleishman and Martha Goldin for Petitioners.

No appearance for Respondent.

Roger Arnebergh, City Attorney, Philip E. Grey and Donald W. Mowat, Assistant City Attorneys, Richard G. Kolostian and Michael T. Sauer, Deputy City Attorneys, for Real Party in Interest.

MOSK, J.—Stewart Burton, manager of the Vista Theater in Los Angeles, and Gregory Giglioli, assistant manager

(hereinafter petitioners), are charged with violating section 103.109 of the Los Angeles Municipal Code, a misdemeanor.[1] The ordinance provides that no person shall engage in the business of exhibiting motion picture films to the public in any theater for compensation without a written permit from the Board of Police Commissioners. The permit must be renewed yearly. (Los Angeles Mun. Code, § 103.06(a).) Section 103.29(b) states that after an investigation the board may deny a permit if it finds that "the said operation will not comport with the peace, health, safety, convenience, good morals, and general welfare of the public." Section 103.31(b) provides that the board shall not issue a permit for a business which has been or is a public nuisance, and section 103.31(c)1 states that the board may deny a permit if the applicant is "unfit to be trusted with the privileges granted by such permit, or has a bad moral character, intemperate habits or a bad reputation for truth, honesty, or integrity."

Petitioners filed demurrers to the complaints on the ground that these ordinances unconstitutionally violate their rights of free speech and press (U.S. Const., 1st and 14th Amends.; Cal. Const., art. I, § 9) as well as their rights to due process and equal protection of the laws (U.S. Const., 14th Amend.; Cal. Const., art. I, § 13). The demurrers were overruled, and petitioners pleaded not guilty to the charges. They seek by this writ of prohibition to restrain respondent court from proceeding with the trial.

The principal issues to be determined are, first, whether a municipality is prohibited from requiring that a permit be obtained for the operation of a motion picture theater; and second, if no constitutional inhibition exists in this regard. whether sections 103.29(b), 103.31(b) and 103.31(c)1 set forth standards for the issuance of a permit so vague and broad as to improperly abridge petitioners' rights of free speech and press. As will appear, we conclude the initial question must be answered in the negative, but there is merit in petitioners' alternative contention.

## I.

We are met at the threshold with a query as to petitioners' standing to challenge these ordinances. The board contends that petitioners lack standing in the absence of a rejected application and that their appropriate remedy is to

---

[1]Burton has been arrested a total of ꞉5 times on different days on this charge, and Giglioli once.

challenge the refusal to grant a permit rather than to operate the theater without authorization and thus invite arrest. It is urged that if the requirement to obtain a permit is valid (§ 103.109), then petitioners' only recourse is to compel the board to issue a license. In other words, the board contends, we must view the four corners of the section in a vacuum and if the city may properly require petitioners to obtain a permit to operate a theater, we must refuse to grant the writ regardless of the constitutionality of the companion ordinances that set forth the standards under which the board must issue or deny the permit.

We hold that the suggested antecedental procedure is not essential. ■■ It is settled that a person has the standing to challenge a statute on the ground that it delegates overly broad licensing authority to an administrative officer whether or not his conduct could be proscribed by a properly drawn enactment and whether or not he has applied for a license. One who could have obtained a license for the asking may call into question the whole scheme of licensing when he is prosecuted for failure to procure it. Standing is recognized in such a situation because of the dangers inherent in tolerating, in the realm of the First Amendment, the existence of a penal statute susceptible of sweeping and improper application. (*Freedman* v. *Maryland* (1965) 380 U.S. 51, 56 [13 L.Ed.2d 649, 653, 85 S.Ct. 734] ; *Staub* v. *Baxley* (1958) 355 U.S. 313, 319 [2 L.Ed.2d 302, 309-310, 78 S.Ct. 277] ; *Thornhill* v. *Alabama* (1940) 310 U.S. 88, 97 [84 L.Ed. 1093, 1099-1100, 60 S.Ct. 736].)

In *Staub* a city ordinance provided that it was a misdemeanor to solicit persons to become members of an organization which assessed dues unless a license was first obtained from the city. In passing upon an application for a permit, city officials were to ''consider the character of the applicant, the nature of the business of the organization for which members are desired to be solicited, and its effects upon the general welfare. . . .'' The appellant was convicted of soliciting memberships without a permit. It was held that the several sections of the challenged ordinance constituted one complete act for the purpose of licensing those in the appellant's position and that she had standing to challenge the ordinance on the ground that it constituted a prior restraint upon speech even though she had not applied for a license. Numerous other decisions make it clear that a person has standing to challenge a licensing statute invalid on its face without first applying for

a license. (See, e.g., *Kunz* v. *New York* (1951) 340 U.S. 290 [95 L.Ed. 280, 71 S.Ct. 312]; *Lovell* v. *Griffin* (1938) 303 U.S. 444, 452-453 [82 L.Ed. 949, 954, 58 S.Ct. 666]; *Smith* v. *Cahoon* (1931) 283 U.S. 553, 562 [75 L.Ed. 1264, 1271-1272, 51 S.Ct. 582].) *Poulos* v. *New Hampshire* (1953) 345 U.S. 395 [97 L.Ed. 1105, 73 S.Ct. 760, 30 A.L.R.2d 987], is distinguishable since there the licensing ordinance had previously been found valid.

## II.

We come, then, to petitioners' claim that section 103.109 is unconstitutional because the requirement that a license be obtained and a fee paid therefor inhibits their rights of free speech and press.

■ It can no longer be questioned that expression by means of motion pictures is included within the free speech and press guarantees of the First and Fourteenth Amendments *(Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 502 [96 L.Ed. 1098, 1106, 72 S.Ct. 777]; *Flack* v. *Municipal Court* (1967) 66 Cal.2d 981, 988 [59 Cal.Rptr. 872, 429 P.2d 192]; *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 242 [49 Cal. Rptr. 537, 411 P.2d 289]), and the fact that petitioners are conducting their business for profit in no way dilutes protection of these rights *(New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 266 [11 L.Ed.2d 686, 698, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Wirta* v. *Alameda-Contra Costa Transit Dist.* (1967) *ante*, pp. 51, 54 [64 Cal.Rptr. 430, 434 P.2d 982]). However, this basic principle does not bestow upon one engaged in the business of exhibiting motion pictures a gratuitous immunity from all restraint in the pursuit of his occupation. A municipality may impose reasonable regulations upon the conduct of an economic enterprise *(In re Porterfield* (1946) 28 Cal.2d 91, 101 [168 P.2d 706, 167 A.L.R. 675]), including the business of operating a motion picture theater *(Tarbox* v. *Board of Supervisors* (1958) 163 Cal.App.2d 373, 377 [329 P.2d 553]).

■ No creditable authority supports an exemption for motion picture theaters from the requirement of obtaining a license pursuant to a city's police power to regulate theaters, and a substantial number of decisions have upheld such authority and the exaction of a license fee. (See, e.g., *Chemline, Inc.* v. *City of Grand Prairie* (5th Cir. 1966) 364 F.2d 721, 728; *City of Morrilton* v. *Malco Theaters* (1941) 202 Ark.

100 [149 S.W.2d 55, 57]; *City of Metropolis* v. *Gibbons* (1929) 334 Ill. 431 [166 N.E. 115, 117-118]; *People* v. *Steele* (1907) 231 Ill. 340 [83 N.E. 236, 237, 121 Am.St.Rep. 321, 14 L.R.A. N.S. 361]; *Kirtley* v. *State* (1949) 227 Ind. 175 [84 N.E.2d 712, 714]; *Central States Theater Corp.* v. *Sar* (1954) 245 Iowa 1254 [66 N.W.2d 450, 456]; see 58 A.L.R. 1340; 111 A.L.R. 778; 4 Am.Jur.2d 150.)

Petitioners rely upon *Thomas* v. *Collins* (1945) 323 U.S. 516 [89 L.Ed 430, 65 S.Ct. 315], in which the United States Supreme Court declared unconstitutional a state statute requiring labor organizers to register with and procure a card from a designated public official before soliciting membership in a labor union. It was held that since the exercise of the rights of free speech and assembly cannot be proscribed, the same result could not be accomplished indirectly by the device of requiring previous registration as a qualification for exercising these rights and making such a condition the foundation for imposition of a penalty. Petitioners maintain that the ordinance under consideration here also requires prior registration in order to exercise lawful First Amendment prerogatives and thereby places an unconstitutional restraint on the exercise of those rights. This contention, while emotionally appealing, overlooks the circumstance that petitioners operate a commercial establishment to which the public is invited for a fee. That First Amendment rights are being utilized on the premises does not exempt a commercial entrepreneur from compliance with reasonable regulations under the police power. The requirement that a license be obtained as a condition of engaging in the motion picture business is a reasonable means of assuring compliance with police power regulations.

■ Petitioners' final point with regard to the validity of section 103.109 is that the city is legislating in an area exclusively occupied by state law. However, section 16000 of the Business and Professions Code specifically provides that the legislative bodies of incorporated cities, such as Los Angeles, may license ''any kind of business not prohibited by law,'' including all shows and exhibitions. The Legislature has clearly manifested no intent to preempt the field of commercial licensing.

### III.

Next we examine the constitutionality of the ordinances prescribing the standards under which the board must act in determining whether to issue a permit. The crucial factor here

is our zealous solicitude for rights falling within the protection of the First Amendment. ▉ In considering the constitutionality of ordinances in the category of that involved here " 'precision of regulation must be the touchstone' " (*Interstate Circuit, Inc.* v. *City of Dallas* (1968) 390 U.S. 676, 982 [20 L.Ed.2d 225, 231, 88 S.Ct. 1298]) and the standards set forth therein must be "susceptible of objective measurement" (*Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 603-604 [17 L.Ed.2d 629, 640-641, 87 S.Ct. 675]). Such precision is exacted because the "threat of sanctions may deter almost as potently as the actual application of sanctions." (*N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 433 [9 L.Ed.2d 405, 418, 83 S.Ct. 328].) A long line of decisions has held unconstitutional ordinances governing the issuance of licenses to conduct First Amendment activities where administrative officials were granted excessive discretion in determining whether to grant or deny the license.

An ordinance empowering city officials to exercise discretion in granting permits to solicit citizens to join an organization in the light of the "character of the applicant" and the "effects upon the general welfare" of the organization for which members were solicited was held unconstitutional in *Staub* v. *City of Baxley* (1958) *supra*, 355 U.S. 313. Ordinances which permitted city officials to deny a license if the applicant was "not of good character or is canvassing for a project not free from fraud" (*Schneider* v. *State* (1939) 308 U.S. 147 [84 L.Ed. 155, 60 S.Ct. 146]) or if in the official's opinion the refusal of a permit would prevent "riots, disturbances or disorderly assemblage" (*Hague* v. *C.I.O.* (1939) 307 U.S. 496 [83 L.Ed. 1423, 59 S.Ct. 954]) have been declared unconstitutional. The same result has obtained where the ordinances provided that a permit could be granted for the distribution of religious publications if the city officials deemed it "proper or advisable" (*Largent* v. *Texas* (1943) 318 U.S. 418 [87 L.Ed. 873, 63 S.Ct. 667]) or the cause for which the applicant desired to solicit was religious (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296 [84 L.Ed. 1213, 60 S.Ct. 900, 128 A.L.R. 1352]), or if the city council was satisfied that the applicant was of "good moral character and will not resort to force, violence, or . . . corrupt means . . . in his proposed work of solicitation" (*In re Porterfield* (1946) *supra*, 28 Cal.2d 91). *A fortiori* an ordinance is unconstitutional if no standards whatever are set forth to circumscribe the discretion of officials in granting or denying licenses.

(*Kunz* v. *New York* (1951) *supra*, 340 U.S. 290; *Saia* v. *New York* (1948) 334 U.S. 558 [92 L.Ed. 1574, 68 S.Ct. 1148]; *Lovell* v. *Griffin* (1938) *supra*, 303 U.S. 444.)

█ Examination of the ordinance involved in the instant case in the light of the foregoing principles undeniably reveals that it does not provide precise standards capable of objective measurement—the sensitive tools to be employed whenever First Amendment rights are involved. As we have seen, section 103.29(b) empowers the board to refuse a permit if it finds that "the said operation will not comport with the peace, health, safety, convenience, good morals, and general welfare of the public" and section 103.31(c)1 enables the board to deny a permit if the applicant is "unfit to be trusted with the privileges granted by such permit, or has a bad moral character, intemperate habits or a bad reputation for truth, honesty, or integrity."

Such overly broad standards are fraught with the hazard that an applicant will be denied his rights to free speech and press through exercise of the power of the board, in its discretion, to refuse a permit because of the content of the films which the applicant exhibits in his theater. For example, the board may consider that an applicant who has exhibited films offensive to the sensibilities of board members does not have "good moral character" or is "unfit to be trusted." The same danger lurks in the board's discretionary power to refuse the permit if in its opinion the "general welfare of the public" and its "good morals" would not justify the issuance. Thus sections 103.29(b) and 103.31(c)1 are unconstitutional as applied to petitioners in that they vest city officials with "virtually unlimited discretionary power to grant or refuse permits and to thereby effectively impose a censorship or previous restraint upon constitutional rights. . . ." (*In re Porterfield* (1946) *supra*, 28 Cal.2d 91, 112.)

Section 103.31(b), under which the board may deny a permit "for a business which has been or is a public nuisance" is likewise defective. The Civil Code defines a nuisance as "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any . . . public park, square, street, or highway. . . ." (Civ. Code, § 3479.) Section 3480 defines a public nuisance as "one which affects at

the same time an entire community or neighborhood, or any considerable number of persons. . . ." (See also Pen. Code, §§ 370, 371.)

The provisions of section 103.31(b) are no less vague than those of sections 103.29(b) and 103.31(c)1. To permit a board to refuse to grant a license for the operation of a motion picture theater because in its subjective opinion the operation may be "indecent or offensive to the senses . . . so as to interfere with the comfortable enjoyment of life or property" of "any considerable number of persons" obviously vests in the board an exorbitant quantum of discretion and fails to meet the constitutional requirement of narrowly circumscribed standards.

We note in passing that the law provides ample methods for eliminating the existence of a nuisance by indictment or information, or by the bringing of a civil suit or an action for abatement. (Civ. Code, § 3491.) It is, of course, within the authority of a municipal legislative body to prescribe what constitutes a nuisance. (Gov. Code, § 38771; *City of Bakersfield* v. *Miller* (1966) 64 Cal.2d 93, 100 [48 Cal.Rptr. 889, 410 P.2d 393].) However, the police board is not a legislative agency, and we are not concerned here with whether particular activity has been properly defined as a nuisance but only with whether an administrative board may refuse to grant a permit to petitioners because in its subjective opinion the business which they operate "has been or is a public nuisance."

*Daniel* v. *Board of Police Comrs.* (1961) 190 Cal.App.2d 566 [12 Cal.Rptr. 226], which upheld the validity of sections of the ordinances considered here, is not apposite to our problem and thus not necessarily in conflict with the views we express. *Daniel* involved a requirement that a license be obtained for premises on which food and beverages were sold and live entertainment provided. The opinion does not discuss the question of licensing activities within the ambit of the First Amendment, but insofar as its language may be deemed inconsistent with the results here announced, *Daniel* is disapproved.

That the danger of censorship inherent in overly broad licensing statutes is not based upon vague abstractions or exaggerated fears of malefic administrative conduct is strikingly illustrated in an empirical analysis of the manner in

which the very ordinance involved in the instant case has been applied by the board. In at least two circumstances it has utilized the provisions of the ordinance for the purpose of banning the screening of motion pictures and a play on the basis of literary content.

In one instance a permit to operate a motion picture theater was revoked under the ordinance on the ground that the operation of the theater would not comport with the "peace, health, safety, convenience, good morals, and the general welfare of the public" although the films which the permittee had exhibited in the past were "not without social importance." The board found that the "general welfare and best interests of the affected community" were violated "as expressed by the hundreds of signatures and scores of letters of protest" relating to the operation of the theater, that the applicant had failed to establish that the films he showed "were not in poor taste and . . . they did, indeed, impose upon the community . . . unwanted and undesired motion pictures contrary to the wishes of a large and vocal segment of said community" and that "the sociological factors contributing to a better and healthier community are not compatible to the negative influences and the immoral characteristics presented by the type of films and the subsequent advertising in front of the theatre, and thus, resulting in a broad community rejection of them." It was also found that "the evidence and testimony . . . expressed a real and joint community concern regarding the exhibition of 'exploitation' type of films" at the theater, "thus creating an atmosphere of doubt and suspicion as to the ability of the respondent to exercise and hold the privilege of a police permit."[2]

In another case the board declined to grant a permit to exhibit a play[3] on the ground that the performance would not comport with the "peace, health, safety, convenience and general welfare of the public" because, assertedly, the play was

---

[2]The applicant sought a writ of mandate to set aside the revocation order, and the Los Angeles Superior Court held that section 103.29(b) and another section of the Los Angeles Municipal Code, containing substantially the same provisions, were unconstitutional. The court decreed that the board's revocation order be set aside. (*Miranda* v. *City of Los Angeles*, L.A. No. 891433.)

[3]Section 103.114 of the Los Angeles Municipal Code requires that a permit be obtained to present any performance for profit in a theater. The standards for the issuance of a permit for a theatrical performance are the same as those set forth above for the issuance of permits to operate a motion picture theater.

obscene as that term is defined in the Penal Code. (Pen. Code, § 311.)[4]

It is difficult to conceive more pervasive indicia of censorship under the cloak of regulation of business activity. In instances of governmental authority seeking to censor in advance motion picture or theatrical performances, the United States Supreme Court has maintained "rigorous insistence upon procedural safeguards and judicial superintendence of the censor's action." (*Interstate Circuit, Inc.* v. *City of Dallas* (1968) *supra,* 390 U.S. 676, 682 [20 L.Ed.2d 225, 231].) No claim is made, nor can there be, that the ordinance involved here complies with the procedural requirements for prior censorship set forth in *Freedman* v. *Maryland* (1965) *supra,* 380 U.S. 51, 58-61 [13 L.Ed.2d 649, 654-656].[5]

The board's application of the ordinance goes beyond the censorship of present or future performances which it subjectively deems to be objectionable. It refuses to grant a license to an applicant who has in the past shown motion pictures admittedly not obscene because he has failed to demonstrate to its satisfaction that the pictures he has exhibited are in "good taste," because a vocal segment of the community objects to them and because, in the board's unfettered judgment, the operation of the theater, showing films with "immoral characteristics" is not "compatible" with a "better and healthier community."

---

[4]In this case also the applicant sought to compel the board to issue a permit. The ordinance was held to be unconstitutional by the Los Angeles Municipal Court (L.A. No. 304511). Thereafter the case was heard in the United States District Court for the Central District of California (No. 68-129-JWC).

[5]Petitioners quote from proceedings before the three-judge federal court referred to in footnote 4, *ante,* page 695. Judge Curtis stated, "We think . . . that in view of *Freedman* v. *Maryland* it is pretty obvious that [the ordinance] is unconstitutional by federal constitutional standards . . . it seems to me the ordinance is unconstitutional on its face as it relates to plays in view of the fact that it does not afford the safeguards which have been made eminently clear by recent Supreme Court decisions, one of the most recent being *Freedman* v. *Maryland.* This obviously does not comply with that or with the cases that have been decided subsequently. It would seem to me so clear that it hardly requires further argument. . . . I don't see how you could have read *Freedman* v. *Maryland* and not understand what we are talking about. That has set up certain standards for an ordinance before it can be held constitutional . . . the act under which the Commission acted is unconstitutional because it doesn't provide the necessary safeguards which the Supreme Court said should be in the ordinance." Judge Curtis added: "All we are saying is if you are going to have a censorship ordinance pertaining to plays it is going to be drafted in accordance with the conditions set forth by the Supreme Court. . . ."

The wisdom of the prevailing rules requiring precise standards for the licensing of activities related to the First Amendment—if any justification be required in this 177th year of the Bill of Rights—can scarcely be more vividly illustrated than by the foregoing examples of unbridled censorship.

We are not unmindful that the operation of a public motion picture theater poses problems which necessitate regulation by appropriate public bodies. We do not doubt that such supervision may be accomplished by the licensing of theaters. Where the regulations are specifically drawn to meet a proper public purpose, such as compelling the theater building to satisfy health, fire and safety laws, or requiring the operation of the business to comply with the law in other specific respects, there is little likelihood that the standards under which the licensing authority acts may be used directly or indirectly as an instrument to suppress an applicant's rights to free speech and press. Since such specificity is clearly lacking in the ordinances under consideration here they are unconstitutional on their face.

In view of our conclusion on the foregoing issues, we need not speculate on whether petitioners' conduct was such that the board could constitutionally have refused them a license under properly drawn standards. It is clear that where First Amendment rights are concerned the statute itself and not the evidence in an individual case establishes the boundaries of permissible conduct. Thus an ordinance must be held invalid if it fails to meet required criteria even though the defendant's conduct may have run afoul of a statute which could have been adopted in satisfaction of those criteria. As stated in *Thornhill* v. *Alabama* (1940) *supra,* 310 U.S. 88, 97-98 [84 L.Ed. 1093, 1099-1100] : "It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. . . . An accused . . . does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities as disclosed by the charge and the evidence introduced against him. . . . Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression." (See

also *N.A.A.C.P.* v. *Button* (1963) *supra,* 371 U.S. 415, 432 [9 L.Ed.2d 405, 417-418].)

Let a peremptory writ of prohibition issue as prayed.

Traynor, C. J., Peters, J., Tobriner, J., and Sullivan, J., concurred.

McComb, J., and Burke, J., dissented.

The petition of the real party in interest for a rehearing was denied July 3, 1968. McComb, J., and Burke, J., were of the opinion that the petition should be granted.