[Civ. No. 54469. Second Dist., Div. Two. Jan. 14, 1980.]

WALNUT PROPERTIES, INC., Plaintiff and Appellant, v.
CITY COUNCIL OF THE CITY OF LONG BEACH,
Defendant and Respondent.

COUNSEL

Rhine, McDaniel & Thorp, Joseph Rhine and Robert L. Thorp for Plaintiff and Appellant.

Robert W. Parkin, City Attorney, and Arthur Y. Honda, Deputy City Attorney, for Defendant and Respondent.

Frederick W. Clough, City Attorney (Santa Barbara), as Amicus Curiae on behalf of Defendant and Respondent.

OPINION

COMPTON, J.—On August 31, 1977, Walnut Properties, Inc. (Walnut) obtained a business license to operate a motion picture theater in the City of Long Beach. Walnut had recently acquired an existing theater from a prior owner. A business license, which is essentially a revenue-producing device, is issued subject to applicable zoning and building regulations. (Long Beach (L.B.) Mun. Code, § 6000.9.)

Walnut opened its theater on December 10, 1977, and shortly thereafter the City of Long Beach (City) through its city council, instituted proceedings which culminated in the revocation of Walnut's business license in June of 1978. The basis for the revocation was a violation of the City's zoning ordinance. That ordinance had been enacted on October 25, 1977, and became effective on November 25, 1977.

This appeal followed Walnut's unsuccessful attempt in the superior court to secure a writ of mandamus compelling the City to set aside its revocation of Walnut's business license. Walnut's petition for mandate attacks the constitutionality of the zoning ordinance.

The zoning ordinance in question (L.B. Mun. Code, § 9120.41, attached hereto as appen. A) creates a category of "adult entertainment business" and prohibits the establishment of such a business in certain locations in the City. Germane to this case is the prohibition against locating an "adult entertainment business" within 500 feet of a residential area, or 1,000 feet of a public school. Walnut's theater falls under both limitations.

Walnut concedes that it did show and plans to continue showing movies which fall within the ambit of the ordinance. Walnut has not applied for a waiver or variance from the zoning restriction. It simply seeks to invalidate the entire ordinance on the grounds that it is an unconstitutional regulation of constitutionally protected conduct. It raises the additional contention that the ordinance is vague, overbroad and vests public officials with excessive discretion in enforcing of the terms of the ordinance.

The ordinance here is patterned after and, in its key provisions, is identical to an ordinance adopted in the City of Detroit, which ordinance was approved by the United States Supreme Court in *Young* v. *American Mini Theatres* (1976) 427 U.S. 50 [49 L.Ed.2d 310, 96 S.Ct. 2440]. Except for Walnut's argument that, as applied to it, the City has improperly given the ordinance retroactive effect, all contentions raised by Walnut were considered and resolved by the *Young* court in favor of the City.

Since Walnut concedes that its operation of the theatre is an "adult entertainment business" as defined by the ordinance, it would ordinarily lack the requisite standing to challenge the ordinance for vagueness or overbreadth. Walnut seeks to avoid the impact of that principle by pointing to the fact that motion pictures are a form of speech and by characterizing the ordinance as an infringement on freedom of speech. (*Broadrick* v. *Oklahoma* (1973) 413 U.S. 601 [37 L.Ed.2d 830, 93 S.Ct. 2908]; *Burton* v. *Municipal Court* (1968) 68 Cal.2d 684 [68 Cal.Rptr. 721, 441 P.2d 281].)

This approach was rejected in *Young* v. *American Mini Theatres, supra,* on the basis that the ordinance did *not* "have a significant deterrent effect on the exhibition of films protected by the First Amendment." (*Young,* at p. 60 [49 L.Ed.2d at p. 320].)

"[T]he only vagueness in the ordinances relates to the amount of sexually explicit activity that may be portrayed before the material can be said to be 'characterized by an emphasis' on such matter. For most films the question will be readily answerable; to the extent that an area of doubt exists, we see no reason why the ordinances are not 'readily subject to a narrowing construction by the state courts.' . . . [W]e think this is an inappropriate case in which to adjudicate the hypothetical

claims of persons not before the Court." (*Young*, at p. 61 [49 L.Ed.2d at p. 320].)

 The *Young* case is dispositive of the vagueness claims raised here. The same reasoning applies to the overbreadth challenge. (*Northend Cinema, Inc.* v. *City of Seattle*, (1975) 90 Wn.2d 709 [585 P.2d 1153].)

In the final analysis Walnut's position essentially is that the City may not create zoning regulations applicable to theatres which are based on the content of the films exhibited therein. It claims a constitutional right to exhibit any nonobscene films it chooses at the location in question.

Walnut correctly points out that motion pictures are included within the free speech and free press protection of the First Amendment. (*Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495 [96 L.Ed. 1098, 72 S.Ct. 777]; *Burton* v. *Municipal Court, supra,* 68 Cal.2d 684.) It does not follow, however, that a motion picture exhibitor has absolute freedom to exhibit every motion picture at any place and under any circumstances that it desires. A municipality may impose regulations upon the operation of any business including that of a motion picture theatre. (*Burton, supra.*)

 It is settled that general regulatory statutes "'*not intended to control the content of speech* but incidentally limiting its unfettered exercise, . . . when they have been found justified by subordinating valid governmental interests,'" do not run afoul of the First Amendment. (*Crownover* v. *Musick,* (1973) 9 Cal.3d 405, 419 [107 Cal.Rptr. 681, 509 P.2d 497].) In particular, zoning ordinances, when reasonable in object and not arbitrary in operation, will be sustained as within the legitimate exercise of the police power. (*Hill* v. *City of Manhattan Beach* (1971), 6 Cal.3d 279 [98 Cal.Rptr. 785, 491 P.2d 369].) If the validity of the legislative classification for zoning purposes is fairly debatable, the courts will not interfere with the municipality's determination of policy. (*Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1 [39 L.Ed.2d 797, 94 S.Ct. 1536]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) Applying these principles, we turn to examine the Long Beach ordinance.

The "adult entertainment" ordinance was passed to insure that "adult entertainment" businesses "will not contribute to the blighting or downgrading of the surrounding neighborhoods. The primary purpose of the regulation is to prevent the concentration or clustering of these businesses in any one area." (L.B. Mun. Code, § 9120.41(a).)

The issue of whether the ordinance is in reality a regulation of conduct protected by the First Amendment was addressed in *Young* v. *American Mini Theatres, supra.* The crucial element for both Justice Stevens, writing for the plurality, and Justice Powell in concurring, was that the ordinance did not restrict access to adult movies or access to the adult movie market.

The City's ordinance here, like the Detroit ordinance, does not prohibit the exhibition of any motion picture. It simply specifies the area within the city where certain well-described types of films may be exhibited.

It is clearly within the power of the City to provide that *no* motion picture theatre can be operated in a residential area or near a public school. The thrust of Justice Steven's opinion in *Young* was that it was also within the City's power to classify theatres according to the content of the films exhibited, so long as that classification has a reasonable basis. The "adult entertainment" classification is a reasonable one.

Walnut has presented no evidence that the City's ordinance in any way restricts or eliminates the access to the "adult entertainment" for those persons who desire to patronize it. In fact, Walnut operates another such theater in a different part of the City. From records which we may judicially notice, it appears that Long Beach has a number of "adult" forms of entertainment operating within its boundaries.

Finally we turn to Walnut's claim that the ordinance as applied to it, has been given retroactive application. This is another way of stating the long-accepted principle that a zoning ordinance may not be used to deprive a person of a vested property right—a violation of due process. (*Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal. App.3d 965 [137 Cal.Rptr. 699]; *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546]; *Hill* v. *City of Manhattan Beach* (1971) 6 Cal.3d 279 [98 Cal.Rptr. 785, 491 P.2d 369].)

The City's ordinance, like most zoning ordinances, has an exemption for existing nonconforming uses. Further, it impacts only on the future establishment of "adult entertainment" businesses. The "establishment" of a new business includes relocation or conversion of an existing business. (L.B. Mun. Code, § 9120.20(c).)

While the theatre in question here, under other ownership, has been in existence for some 25 years, it previously operated as the usual neighborhood type theater. Walnut obtained its business license on the representation that it simply intended to continue the existing type of operation, exhibiting "family" type films. The theatre was in fact closed for remodeling at the time Walnut obtained its license and did not open again until well after the effective date of the new zoning ordinance.

█ Walnut did not acquire a vested right to operate an "adult entertainment" business by the acquisition of a closed building and a business license to operate a motion picture theatre. In other words, the property was not being put to a lawful use which use continued up to and after the time the use became unlawful or nonconforming. (*Hill* v. *City of Manhattan Beach, supra;* also see *Benson* v. *City of Long Beach* (1943), 61 Cal.App.2d 189 [142 Cal.Rptr. 440], and *Raley* v. *California Tahoe Regional Planning Agency, supra.)*

We view Walnut's situation as no more of a hardship than that imposed on the property owner in *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508 [125 Cal.Rptr. 365, 542 P.2d 237]. There the property owner acquired land zoned for commercial use at a purchase price in excess of $500,000. The intent was to construct a shopping center. Before construction commenced the City "down-zoned" the property to residential, single family dwellings, thereby reducing the value of the property to about one-tenth of what the property owner had paid to purchase it. In *HFH, Ltd., supra,* at page 516, our Supreme Court held that "'A purchaser of land merely acquires a right to continue a *use instituted* before the enactment of a more restrictive zoning.'" (Italics added.) The court further stated that "a zoning action which merely decreases the market value of property does not violate the constitutional provisions forbidding uncompensated taking or damaging, . . ." (P. 518.)

The judgment is affirmed.

Fleming, Acting P. J., and Beach, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 13, 1980.

APPENDIX A

SECTION 9120.41—*Provisions Regulating the Location of "Adult Entertainment" Businesses.* (a) *Regulated Uses.* The City Council finds that "adult entertainment" businesses, because of their very nature, are recognized as having objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances, thereby having a deleterious effect upon the adjacent areas. Special regulation of these businesses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhoods. The primary purpose of the regulation is to prevent the concentration or clustering of these businesses in any one area.

(b) *Definitions.*

1. For purposes of this Section, the "adult entertainment" businesses are defined as follows:

A. "Adult Book Store"—An establishment having as a substantial or significant portion of its stock in trade, books, magazines and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas" or an establishment with a segment or section devoted to the sale or display of such materials.

B. "Adult Motion Picture Theater"—An enclosed building with a capacity of fifty or more persons used for presenting material distinguished or characterized by their emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas" for observation by patrons therein.

C. "Adult Mini Motion Picture Theater"—An enclosed building with a capacity for less than fifty persons used for presenting material distinguished or characterized by an emphasis on matter depicting or relating to "specified sexual activities" or "specified anatomical areas" for observation by patrons therein.

D. "Adult Hotel or Motel"—A hotel or motel wherein material is presented which is distinguished or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas."

E. "Adult Motion Picture Arcade"—Any place to which the public is permitted or invited wherein coin or slug-operated or electronically, electrically or mechanically controlled still or motion picture machines, projectors or other image-producing devices are maintained to show images to five or fewer persons per machine at any one time, and where the images so displayed are distinguished or characterized by an emphasis on depicting or describing "specified sexual activities" or "specified anatomical areas."

F. "Cabaret"—A nightclub, theater or other establishment which features live performances by topless and/or bottomless dancers, "go-go" dancers, exotic dancers, strippers, or similar entertainers, where such performances are distinguished or characterized by an emphasis on "specified sexual activities" or "specified anatomical areas."

G. "Massage Parlor"—Any establishment licensed as a massage parlor pursuant to Section 6223.1 of the Long Beach Municipal Code where, for any form of consideration or gratuity, massage, alcohol rub, administration of fomentations, electric or magnetic treatments, or any other treatment or manipulation of the human body occurs.

H. "Model Studio"—Any business where, for any form of consideration or gratuity, figure models who display "specified anatomical areas" are provided to be observed, sketched, drawn, painted, sculptured, photographed, or similarly depicted by persons paying such consideration or gratuity.

I. "Sexual Encounter Center"—Any business, agency or person who, for any form of consideration or gratuity, provides a place where three or more persons, not all members of the same family, may congregate, assemble or associate for the purpose of engaging in "specified sexual activities" or exposing "specified anatomical areas."

J. Any other business or establishment which offers its patrons services or entertainment characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas."

2. For purposes of this Section, "specified sexual activities" shall include the following:

A. Actual or simulated sexual intercourse, oral copulation, anal intercourse, oral anal copulation, beastiality, direct physical stimulation of unclothed genitals, flagellation or torture in the context of a sexual relationship, or the use of excretory functions in the context of a sexual relationship, and any of the following depicted sexually oriented acts or conduct: analingus, buggery, coprophagy, coprophilia, cunnilingus, fellatio, necrophilia, pederasty, pedophilia, piquerism, sapphism, zooerasty; or

B. Clearly depicted human genitals in a state of sexual stimulation, arousal or tumescence; or

C. Use of human or animal masturbation, sodomy, oral copulation, coitus, ejaculation; or

D. Fondling or touching of nude human genitals, pubic region, buttocks or female breast; or

E. Masochism, erotic or sexually oriented torture, beating or the infliction of pain; or

F. Erotic or lewd touching, fondling or other contact with an animal by a human being; or

G. Human excretion, urination, menstration, vaginal or anal irrigation.

3. For purposes of this Section, "specified anatomical areas" shall include the following:

A. Less than completely and opaquely covered (1) human genitals, pubic region; (2) buttock, and (3) female breast below a point immediately above the top of the areola; and

B. Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

(c) *Special Regulations.* In those land use districts where the "adult entertainment" businesses regulated by this Section would otherwise be permitted uses, it shall be unlawful to establish any such "adult entertainment" business if the location is:

1. Within five hundred feet of any area zoned for residential use;

2. Within one thousand feet of any other "adult entertainment" business; or

3. Within one thousand feet of any public or private school, park, playground, public building, church, any non-commercial establishment operated by a bona fide religious organization, or any establishment likely to be used by minors.

The "establishment" of any "adult entertainment" business shall include the opening of such a business as a new business, the relocation of such business, or the conversion of an existing business location to any "Adult entertainment" business use.

(d) *Waiver of Locational Provisions.*

1. Any property owner or his authorized agent may apply to the Planning Commission for a waiver of any locational provisions contained in this Section. The Planning Commission, after a hearing, may waive any locational provision, if the following findings are made:

A. That the proposed use will not be contrary to the public interest or injurious to nearby properties, and that the spirit and intent of this Section will be observed;

B. That the proposed use will not enlarge or encourage the development of a "skid row" area;

C. That the establishment of an additional regulated use in the area will not be contrary to any program of neighborhood conservation nor will it interfere with any program of urban renewal;

D. That all applicable regulations of this Code will be observed.

2. The procedure for this hearing shall be the same as that provided in Section 9120.25 of the Municipal Code, with, among other matters, the same notice requirements, the same right of appeal to the City Council, and the same fees payable by the applicant. The Planning Department shall prepare the necessary application form for this waiver.

(e) *Severability.* If any provision or clause of this Section or the application thereof to any person or circumstance is held to be unconstitutional or otherwise invalid by any court of competent jurisdiction, such invalidity shall not affect other provisions or clauses or applications of this Section which can be implemented without the invalid provision, clause or application; and to this end, the provisions and clauses of this Section are declared to be severable. (Added by Ord. C-5360, 10-25-77)