[Civ. No. 29032. Fourth Dist., Div. Two. May 19, 1983.]

CITY OF INDIO, Plaintiff and Respondent, v.
CHRIS ARROYO et al., Defendants and Appellants.

COUNSEL

Ronald A. Zumbrun, Harold J. Hughes and Gary C. Scherotter for Defendants and Appellants.

David J. Erwin, City Attorney, Michael J. Andelson and Douglas S. Phillips, Deputy City Attorneys, and Erwin & Anderholt, for Plaintiff and Respondent.

OPINION

**MORRIS, P. J.**—In this appeal we consider whether provisions of the city of Indio's sign ordinance violate the First Amendment to the United States Constitution and article I, section 2 of the California Constitution.[1]

### I.

Chris and Cecilia Arroyo operate a small convenience store on the site of a formerly abandoned gas station in Indio. Several years ago, the Arroyos boarded up one of the abandoned service bays and had an artist friend, Tony Flores,

---

[1]In this opinion we use the phrase "First Amendment" to refer to both federal and state constitutional guarantees.

paint a mural on it. The mural, in Cecilia Arroyo's words, "depict[s] aspects of our ethnic Mexican heritage. Many of the scenes depicted on the mural reflect aspects of the Aztec Indian contribution to our heritage. Some of the scenes portray the geography, indigenous plants, and archaeology of Mexico. A part of the mural depicts social advancements of the Mexican people in contemporary society as well as reflections upon a colonial period of Mexican history. The mural also depicts today's youth viewing the future."

The mural is 110 square feet in area, and the building frontage of the Arroyos' convenience store is 45 linear feet. The store has a detached sign, and another attached sign 30 square feet in area. The store is located in an area which is zoned C-1.

Chapter 4 of the Indio City Code regulates signs. Section 4.1 provides that no signs shall be erected except those specifically allowed by the ordinance. Section 4.2 defines "sign" as "any writing (including letter, word, or numeral) pictorial presentation (including illustration or decoration), emblem (including device, symbol or trademark), flag (including banner or pennant); and [¶] 1. Is a structure or any part thereof or is attached to, painted on, or in any other manner represented on a building or other structure or device, or is in any way attached thereto, and [¶] 2. Is used to announce, direct attention to or advertise, and [¶] 3. Is visible from outside the building or structure."

Advance permits are required to erect, alter or relocate signs (§ 4.3), with partial exceptions for bulletin boards, professional occupation signs, memorial signs or tablets, traffic signs, real estate signs, development signs, newspaper stands, house numbers, warning signs and store window signs (§ 4.4).

For business and commercial uses in areas zoned C-1, only window advertising and "indentification signs" are allowed (§ 4.8). "Identification signs" are signs "other than a bulletin board, which serves to tell the name, address and lawful uses of the premises upon which the sign is located" (§ 4.2). There may be no more than one detached sign. "Attached signs shall not exceed 2 sq. ft. of sign for each 1 linear ft. of bldg. frontage or 40% of the background facing on which they are placed, whichever is greater" (§ 4.8).

The city planning director oversees the issuance of sign permits (§§ 4.2, 4.3). This official is vested with wide discretion. "The number and area of signs as outlined in this [ordinance] are intended to be maximum [sic] standards which do not necessarily insure architectural compatibility. Therefore, in addition to the enumerated standards, consideration shall be given to a sign's relationship to the overall appearance of the subject property as well as the surrounding community. Compatible design, simplicity and sign effectiveness are to be used in establishing guidelines for sign approval" (§ 4.1). Signs must

complete a "design review" process. Permits may not be issued by the planning director if the sign does not comply with all city ordinances (§ 4.3).

If the planning director finds a sign to be in violation of any provision of the sign ordinance, he must give written notice of the violation to the permit holder or owner of the property. If the sign is not removed or brought into conformance within 30 days of such notice, the planning director is authorized to paint over the sign "in such a way that the sign shall not thereafter be or become visible" or he may have it "removed altogether" (§ 4.12). Other provisions of Indio's sign ordinance relate to structural safety and maintenance (§§ 4.6, 4.7), and regulate political signs (§ 4.5).

Section 4.13 of the sign ordinance provides that variances for nonconforming signs may be granted by the city planning commission under the terms of chapter 25 of the city code, comprising the city's zoning ordinance. Section 25.186 of the code states:

"The planning commission may grant a variance providing that it finds:

"(A) No special privilege is extended to one individual property owner, i.e., the circumstances must be such that the same variance would be appropriate for any property owner facing similar circumstance[s]; and

"(B) The granting of the variance will not be injurious to public welfare, nor to property in the vicinity of the application; and

"(C) The variance shall be in harmony with the general purpose and intent of the zoning ordinance and general plan; and

"(D) A variance, if approved, shall be made subject to such conditions as are necessary to accomplish the purpose of these regulations; and

"(E) In no event shall a variance be used to allow a use not otherwise permitted in a zone."

Persons aggrieved by decisions of the planning commission may appeal to the city council (§ 25.190).

## II.

On April 3, 1981, Indio Planning Director W. M. Northrup hand-delivered a letter he had written to Chris and Cecilia Arroyo, informing them that their mural was in violation of the sign ordinance. The letter stated that the Arroyos could have two identification signs on the store property; one could be de-

tached. The area of the attached sign could not exceed 90 square feet. "You have a couple of choices," wrote Northrup. "1. Apply for a sign permit for the mural. If it is the only sign on the building and it does not exceed 90 square feet, staff will do the 'design review' which is in the cost of the permit. If you do not receive staff approval of the design you can appeal to the planning commission at no cost. You can assume that an appeal will be necessary based on my viewing of the mural-sign. 2. You can apply for a sign variance to allow the sign-mural as it presently exists. This can be done as an additional sign, or as an oversize sign, or both. The filing fee is $150."

The Arroyos applied for a variance, and on May 26, the planning commission held a hearing on the variance application. The planning department staff recommended that the variance be denied.

Cecilia Arroyo spoke in support of her application. Only one person opposed the variance. The leader of a community group stated his belief that "[t]oo much importance is lended to works of art," and suggested that murals "should be inside a building or on public buildings on an approved method of producing the art, perhaps under an art committee for the city." After some discussion, in which two of the six commission members present recognized that the mural "probably is a piece of art," the commission voted to deny the variance.

The Arroyos appealed to the city council. Following a public hearing, the council voted to deny the variance.

The planning director ordered the removal of the mural, and, thereafter, Indio filed this action against the Arroyos to have the mural declared a public nuisance, for injunctive relief barring the Arroyos "from keeping and maintaining a sign/mural," and for an order permitting the city "to remove, or paint over the defendants' sign/mural" and to recover costs.

The superior court issued a preliminary injunction, finding that the mural violated the city code "in that the total number and maximum area of signs permitted at the defendants' property has been exceeded." The court held that the provisions of the sign ordinance were "neither overbroad nor uncertain," "not unconstitutional on their face, nor as applied," and "do not interfere with the defendants' rights guaranteed under the First Amendment to the United States Constitution and article I, section 2 of the California Constitution." Enforcement of the sections "will not interfere with the defendants' constitutional rights," and the "issuance of a preliminary injunction will not interfere with the defendants' freedom of speech." This appeal followed.

### III.

■ The city contends that the Arroyos have no standing to assert First Amendment interests in this matter. Specifically, it is argued that the Arroyos

commissioned the mural solely for the purpose of beautifying their business premises, and had no ideological interest in the content of the mural; therefore, "appellants can have no valid claim that their freedom of speech has been curtailed." This argument is based on statements made by Cecilia Arroyo at the planning commission hearing to the effect that "if [the mural] had been [a picture of] George Washington, it would have been all right for us."

The city's argument erroneously assumes that the asserted nonideological intent of a publisher of protected expression strips that expression of its First Amendment protection. United States Supreme Court cases indicate otherwise. In *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], the Supreme Court found that a newspaper which published a paid political advertisement had standing to assert that the First Amendment limited a state's power to award damages against it in a libel action. (*Id.*, at pp. 265-266 [11 L.Ed.2d at pp. 697-698].) More recently, in *Metromedia, Inc.* v. *San Diego* (1981) 453 U.S. 490 [69 L.Ed.2d 800, 101 S.Ct. 2882], the court found that a billboard company could properly assert the protected speech interests of its noncommercial billboard space purchasers. (*Id.*, at p. 504, fn. 11 [69 L.Ed.2d at p. 812].) We conclude that the Arroyos need not have any particular subjective intent in order to claim that the First Amendment protects their mural.

## IV.

The general principles that control the review of statutes or ordinances which regulate or restrict the exercise of First Amendment rights are well established. Any such law must survive "exacting scrutiny." (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 786 [55 L.Ed.2d 707, 724, 98 S.Ct. 1407].) It must further an "important" or "substantial" government interest. (*United States* v. *O'Brien* (1968) 391 U.S. 367, 376-377 [20 L.Ed.2d 672, 679-680, 88 S.Ct. 1673]; *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 84 [112 Cal.Rptr. 777, 520 P.2d 1].) And the law must be neither vague nor substantially over- or underinclusive, but drawn with narrow specificity to avoid unnecessary intrusion on freedom of expression. (*Schad* v. *Mount Ephraim* (1981) 452 U.S. 61, 68-71 [68 L.Ed.2d 671, 679-681, 101 S.Ct. 2176]; *Morris* v. *Municipal Court* (1982) 32 Cal.3d 553, 565 [186 Cal.Rptr. 494, 652 P.2d 51].) Laws which impose prior restraints on the exercise of First Amendment rights are presumptively unconstitutional. (*Vance* v. *Universal Amusement Co.* (1980) 445 U.S. 308, 317 [63 L.Ed.2d 413, 421, 100 S.Ct. 1156]; *Kuhns* v. *Board of Supervisors* (1982) 128 Cal.App.3d 369, 374 [181 Cal.Rptr. 1].)

Not all speech receives the same degree of constitutional protection. "[O]bscene material is unprotected by the First Amendment." (*Miller* v. *Cali-*

*fornia* (1973) 413 U.S. 15, 23 [37 L.Ed.2d 419, 430, 93 S.Ct. 2607].) And the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." (*Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n* (1980) 447 U.S. 557, 563 [65 L.Ed.2d 341, 349, 100 S.Ct. 2343].) Freedom of ideological expression, on the other hand, is a central First Amendment value. "Ideological expression, be it oral, literary, pictorial, or theatrical, is integrally related to the exposition of thought— thought that may shape our concepts of the whole universe of man." (*VA. Pharmacy Bd.* v. *VA. Consumer Council* (1976) 425 U.S. 748, 779 [48 L.Ed.2d 346, 369, 96 S.Ct. 1817] (conc. opn. of Stewart, J.), quoted, *Metromedia, Inc., supra,* 453 U.S. at p. 505, fn. 12 [69 L.Ed.2d at p. 813].)
■ Although the Arroyos' mural appears on the wall of a commercial establishment, it is clearly ideological expression, not commercial speech. It is guaranteed a high degree of constitutional protection.

The ordinance before us imposes a system of prior restraint through its permit requirement. As we have noted above, the ordinance makes it generally unlawful for any person to erect a sign in the city without first obtaining a permit (§ 4.3), and the city planning director is given considerable latitude in the issuance of permits.

The governmental interest the City of Indio seeks to further through its sign ordinance is a general interest in the city's esthetic environment. Such an interest is unquestionably proper. (*Metromedia, Inc.* v. *San Diego, supra,* 453 U.S. at pp. 507-508 [69 L.Ed.2d at pp. 814-815]; *Penn Central Transp. Co.* v. *City of New York* (1978) 438 U.S. 104, 129 [57 L.Ed.2d 631, 651, 98 S.Ct. 2646].)

The city's interest in its esthetic environment is directly advanced by the ordinance's regulation of commercial speech. We have little doubt that if, for example, the Arroyos' wall advertised "COLD BEER, COME INSIDE!" it could properly be regulated in the precise fashion contemplated with regard to the mural as it exists. (See, e.g., *Young* v. *American Mini Theatres* (1976) 427 U.S. 50, 69, fn. 32 [49 L.Ed.2d 310, 325, 96 S.Ct. 2440].) Yet asserted governmental interests "'may well support regulation directed at [some] activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions.'" (*Schad* v. *Mount Ephraim, supra,* 452 U.S. at p. 69 [68 L.Ed.2d at p. 681], quoting *Schneider* v. *State* (1939) 308 U.S. 147, 161 [84 L.Ed. 155, 164, 60 S.Ct. 146].) That is the case here.

In its purpose of preventing urban blight, the ordinance reaches beyond the permissible regulation of commercial advertisements and announcements to proscribe private efforts to relieve that same blight. The city's legitimate in-

terest in its esthetic environment cannot be a justification for suppressing the rights of those private persons who seek to improve that environment. The stifling of artistic expression is a perverse result to claim as a victory for esthetics.

The purpose of Indio's sign ordinance is not served by its application to noncommercial wall murals, and we hold the ordinance overbroad as applied to such murals.

We strongly emphasize, however, that our holding does not place wall murals beyond all municipal regulation. If the city could demonstrate, for example, that the mural posed a traffic hazard, or that the building on which it appeared failed to comply with structural or fire safety requirements, then abatement would be proper. Similarly, if the mural met the constitutional tests for obscenity, regulation would be legitimate. (See *Miller* v. *California, supra,* 413 U.S. 15.) As we have indicated above, commercial speech falls within the ordinance's constitutional sweep. What the city cannot do, however, is suppress the ideological expression of its residents in pursuit of a municipal interest in esthetics. As the United States Supreme Court has recognized, esthetic judgments by governments "are necessarily subjective." (*Metromedia, Inc., supra,* 453 U.S. at p. 510 [69 L.Ed.2d at p. 816].) When fundamental rights of speech such as the Arroyos assert are at stake, governments must have something more than a generalized esthetic interest to justify their suppression.

## V.

As well as being unconstitutionally overbroad, Indio's sign ordinance has procedural defects of constitutional dimension. Statutes or ordinances which govern the issuance of permits or licenses to exercise First Amendment rights must provide definite, objective guidelines for issuance or denial. (*People* v. *Fogelson* (1978) 21 Cal.3d 158, 166 [145 Cal.Rptr. 542, 577 P.2d 677]; *Burton* v. *Municipal Court* (1968) 68 Cal.2d 684, 691 [68 Cal.Rptr. 721, 441 P.2d 281]; *Ebel* v. *City of Garden Grove* (1981) 120 Cal.App.3d 399, 406 [176 Cal.Rptr. 312.) This ordinance fails to do so.

In *City of Imperial Beach* v. *Escott* (1981) 115 Cal.App.3d 134, 137-138 [171 Cal.Rptr. 197], Division One of this district struck down an ordinance remarkably similar to the one in issue here as violative of the First Amendment. The ordinance there required a conditional use permit to operate "adult" bookstores, and provided:

"*Issuance criteria.* After the public hearing, the planning commission *may,* by resolution, grant a conditional use permit if the commission finds, from the evidence presented in the application or at the hearing, that all of the following facts exist:

"A. That the proposed use at the particular location is necessary or desirable to provide a service or facility which will contribute to the general well-being of the neighborhood or community;

"B. That such use will not, under the circumstances of the particular case, be detrimental to the health, safety, or general welfare of persons residing or working in the vicinity, or injurious to property or improvements in the vicinity;

"C. That the proposed use will comply with the regulations and conditions specified in this title for such use and for other uses permitted in the same zone;

"D. That the granting of such conditional use will be in harmony with the purpose and intent of this title and the general plan of the city." (Italics added.)

Relying on *Burton* v. *Municipal Court, supra,* 68 Cal.2d 684, and *Barry* v. *City of Oceanside* (1980) 107 Cal.App.3d 257 [165 Cal.Rptr. 697], the *Imperial Beach* court found that subsections A and B of the quoted ordinance, with their requirements of planning commission findings that the proposed use contribute to "general well-being" and not be detrimental to the health, safety or general welfare of persons in the area, established a "subjective standard" incapable of the precise "objective" measurement demanded by the First Amendment. (115 Cal.App.3d at pp. 138-139.) The court also found since the ordinance provided only that the planning commission "may" grant a permit if certain findings are made, it "confer[red] unlimited authority to deny any application . . . ." It was thus held "unconstitutionally vague, overbroad, and a prior restraint against . . . protected activity." (115 Cal.App.3d at p. 139.)

More recently, in *Ebel* v. *City of Garden Grove, supra,* this court struck down a conditional use permit ordinance much like the one in *Imperial Beach.* The ordinance there contained no apparent requirement that the use permit be issued even if all criteria were satisfied; we held the ordinance unconstitutional on its face "because there is no assurance that a permit will ever issue under any circumstance." (120 Cal.App.3d p. 409.) We found the criteria for permit issuance to be "subjective," and noted that "'the vice of vagueness is particularly pronounced where *expression* is subject to licensing.' [Citation.]" (*Id.,* at p. 408.)

Indio's sign ordinance contains the same vices which rendered the ordinances of Garden Grove and Imperial Beach invalid. The planning director is empowered to grant permits in the first instance, and must consider not only the standards set forth in the ordinance, but also must exercise his personal esthetic judgment in assessing "architectural compatibility," and "simplicity and sign effectiveness." (§ 4.1; see § 4.2.) This official may deny permits for signs

displaying "indecent or immoral matter" in his apparent sole discretion. (§§ 4.9, 4.3.)

Appeals from the planning director's decisions may be made to the planning commission, which "may" grant a variance and issue a permit, but is under no requirement to do so even if all criteria are satisfied. (§§ 4.13, 25.186.) The criteria provide that the planning commission must find that the granting of the variance "will not be injurious to public welfare" and "shall be in harmony with the general purpose and intent of the [sign] ordinance and general plan." (§ 25.186.) These criteria virtually mirror those held unconstitutional in *Ebel* (compatibility standard), *Imperial Beach* ("the general well-being"), *Barry* ("the public health, welfare, and safety") and *Burton* ("injurious to health, or is indecent or offensive to the senses"). Indio's ordinance provides that persons aggrieved by decisions of the planning commission may appeal to the city council (§ 25.190), yet no standards are set forth for that review.

Indio's ordinance cannot be meaningfully distinguished from those held invalid in cases such as *Ebel, Imperial Beach,* and *Burton*. Accordingly, we find it unconstitutional on its face.

The judgment against defendants is reversed.

Kaufman, J., and McDaniel, J., concurred.

A petition for a rehearing was denied June 9, 1983, and respondent's petition for a hearing by the Supreme Court was denied July 27, 1983.