Filed 11/20/23

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>JAIME MOSQUEDA et al.,<br><br>      Defendants and Respondents. | C097326<br><br>(Super. Ct. No. 21FE016941) |

APPEAL from a judgment of the Superior Court of Sacramento County, Bunmi O. Awoniyi, Judge. Reversed with directions.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri, Tia M. Coronado, Deputy Attorney General, for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

1

In *New York State Rifle & Pistol Assn. v. Bruen* (2022) 597 U.S. __ [142 S.Ct. 2111, 213 L.Ed.2d 387] (*Bruen*), the United States Supreme Court declared that the Second and Fourteenth Amendments to the federal constitution protect an individual's right to carry a handgun outside the home for self-defense. (*Id.* at p. 2122.)

The high court also held that the Second Amendment right is "subject to certain reasonable, well-defined restrictions." (*Bruen, supra*, 142 S.Ct. at p. 2156.) The court clarified a test it had earlier applied in *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*) for determining whether a government regulation violates that right. The court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." (*Bruen,* at p. 2126.) Accordingly, to justify a firearms regulation, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." (*Ibid.*) A court may declare that an individual's conduct falls outside the Second Amendment's " 'unqualified command' " only if the regulation is consistent with the nation's historical tradition. (*Ibid.*)

Applying that test, the *Bruen* court held that an element of New York's handgun licensing regime violated the Second Amendment right to carry a handgun in public for self-defense. The regime conditioned issuance of a license to carry a concealed firearm on a discretionary finding of an individual's showing of "proper cause," which New York courts had defined as a special need for self-defense. (*Bruen, supra*, 142 S.Ct. at pp. 2122-2123.) The Supreme Court concluded that New York did not establish a historical tradition of American governments requiring law abiding citizens to demonstrate a special need for self-defense different from the general community in order to carry arms in public. (*Id*. at p. 2156.)

California's handgun licensing regime is similar to New York's. (*Bruen, supra*, 142 S.Ct. at pp. 2123-2124.) Carrying a concealed handgun in public, whether loaded or unloaded, is generally prohibited unless the individual obtains a license. (*Peruta v.*

*County of San Diego* (9th Cir. 2016) 824 F.3d 919, 925, abrogated in part by *Bruen*, at p. 2122.)  The county sheriff or chief of police "may issue" a license to carry a concealed handgun upon proof that "good cause" exists for issuing the license.  (Pen. Code, §§ 26150, subd. (a)(2); 26155, subd. (a)(2) [subsequent undesignated references to statutes are to the Penal Code; because the licensing requirements in sections 26150 and 26155 are identical, our references to section 26150 include by this reference the relevant provisions in section 26155].)  The applicant must be fingerprinted and pass a background check and must also prove that he or she is of "good moral character," resides or works in the issuing county or city, and has completed a firearm safety course. (§§ 26150, subd. (a)(1), (3)-(4); 26155, subd. (a)(1), (3)(4); 26185, subd. (a); 26195, subd. (a).)  The People agree that *Bruen* invalidated the "good cause" requirement in California's licensing scheme.

Relying on *Bruen*, individuals charged in California with unlawfully possessing a handgun have contended that their charges and resulting convictions are unconstitutional. They have argued, unsuccessfully, that *Bruen* rendered California's entire licensing scheme facially unconstitutional, and as a result, it was unconstitutional to punish nonfelons such as them for carrying a firearm in public solely because they did not have a license.  (See *In re T.F.-G.* (2023) 94 Cal.App.5th 893; *People v. Miller* (2023) 94 Cal.App.5th 935 (*Miller*); *In re D.L.* (2023) 93 Cal.App.5th 144.)

Defendants and respondents Jaime Mosqueda and Juanita Mosqueda successfully raised the same contention against their unlawful possession charges by demurrer in the trial court.  We agree with our judicial peers that defendants had standing to raise the defense by demurrer, but also that *Bruen* did not render California's entire licensing scheme or the charges against them unconstitutional.  The offending "good cause" requirement is severable from the remainder of the licensing statute, as is the "good moral character" element which we assume only for purposes of argument to violate the test laid down in *Bruen*.  *Bruen* is also not grounds for a facial attack on the discretionary

3

nature of California's licensing scheme, and it did not invalidate any of the other licensing provisions in section 26150. We reverse the trial court's judgment of dismissal, which concluded otherwise.

BACKGROUND AND HISTORY OF THE PROCEEDINGS

We derive the facts of the arrest from the People's opposition to defendants' demurrers. After executing a search warrant at a residence, detectives observed defendant Juanita Mosqueda drive up to the residence, exit her car, and walk into the residence's side yard. Defendant Jaime Mosqueda also drove up to the residence. Juanita exited the side yard with a black bag. She gave the bag to Jaime, who then drove away. Detectives stopped Jaime's car, and they retrieved the bag from the passenger floorboard. They found a loaded handgun inside the bag. The handgun was not registered to either defendant.

The People charged each defendant with unlawfully carrying a concealed firearm, carrying a loaded firearm on one's person or in a vehicle, and other charges not relevant here. (§§ 25400, subd. (a)(2); 25850, subd. (a).) Defendants pleaded not guilty, but prior to the preliminary hearing they filed demurrers pursuant to section 1004, subdivision 4, on the ground the facts did not constitute a public offense. They contended section 26150's licensure requirements to show "good cause" and "good moral character" were unconstitutional under *Bruen*. And because those licensing requirements were invalid, the entire licensing scheme was invalid, and defendants could not be prosecuted for carrying a concealed handgun without a license.

Defendants asserted they had standing to contest the state licensing scheme by demurrer whether or not they applied for a license. They faced an injury capable of being redressed: imprisonment based on an unconstitutional statute. And First Amendment jurisprudence which granted standing to persons affected by unconstitutional licensing

4

laws whether or not they applied for a license logically applied to similar claims under the Second Amendment.

The trial court sustained the demurrers and dismissed the action. It ruled that *Bruen* wholly invalidated California's licensing scheme. And because *Bruen* declared the public carrying of firearms to be "presumptively legal," defendants could not be prosecuted under statutes criminalizing public carry without a license.

The trial court also held that defendants had standing to challenge the licensing scheme whether or not they applied for a license. The court relied on First Amendment standing law and found it applicable to rights protected under the Second Amendment.

The People appeal from the judgment of dismissal. They contend the trial court erred in finding that defendants had standing because defendants had not applied for and been denied a concealed carry license. The People assert the First Amendment standing cases relied on by the trial court do not apply.

The People also contend the trial court erred in holding that *Bruen* wholly invalidated California's concealed carry licensing scheme. They argue that *Bruen* invalidated only the "good cause" requirement. That requirement is severable from the rest of the licensing scheme which remains constitutional. The People claim that the trial court's interpretation of *Bruen* was overly broad.

Defendants did not file a respondent's brief.

DISCUSSION

I

*Standard of Review*

A demurrer challenges defects appearing on the face of the pleading and raises only issues of law. (*People v. Biane* (2013) 58 Cal.4th 381, 388.) We review the trial court's order de novo. (*People v. Perlas* (2020) 47 Cal.App.5th 826, 832.)

5

Although defendants did not file a respondent's brief, we may decide the appeal on the record, the opening brief, and any oral arguments. (Cal. Rules of Court, rule 8.360(c)(5)(B).) As the appealing party, the People bear the affirmative burden to show error. (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 110, fn. 1.)

II

*Standing*

The People claim defendants lacked standing to challenge the constitutionality of the concealed carry licensing scheme by demurrer because they did not suffer a constitutional injury. Specifically, defendants did not argue that they had applied for concealed handgun licenses and been denied. And even assuming *Bruen* invalidated the good cause requirement for a license, the People argue that defendants did not show they would have satisfied the remaining valid conditions for obtaining a license had they applied.

We assume, as the California Supreme Court does, that a criminal defendant may challenge the validity of the statute under which he or she is being prosecuted by demurrer. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1091, fn. 10; § 1004, subd. 4.) As part of that demurrer, the defendant may raise a facial challenge against the statute's constitutionality. (See *id.* at pp. 1091-1092 [defendants charged with violating camping ban ordinance could challenge ordinance's facial constitutionality by demurrer].) The defendant may not, however, raise an as-applied challenge on demurrer. (*Id.* at p. 1085.)

Before the trial court, defendants contended they had standing because the state was "seek[ing] to impose penal sanctions on a person when one of the required elements that the state must prove is unconstitutional. . . . [T]he Defendant has an injury—arrest—connected to the unconstitutional licensing scheme that can be redressed in our courts."

Their statement notwithstanding, defendants did not contend that any of the elements of the crimes they are charged with committing under sections 25400 and 25850 are unconstitutional. Rather, they contended the licensing statute under which they could have obtained a defense against their prosecutions is wholly unconstitutional under *Bruen*, and that even though they did not attempt to obtain a license and gain that defense, the unconstitutionality of the licensing statute renders the criminal enforcement of weapons possession laws unconstitutional. They have standing because they are in jeopardy of losing their liberty based on the unconstitutional licensing scheme.

Almost a century ago, the United States Supreme Court held that the standing requirement of obtaining a license before challenging the constitutionality of a licensing scheme does not apply when an individual is being criminally prosecuted under a facially unconstitutional statute. (*Smith v. Cahoon* (1931) 283 U.S. 553, 562 (*Smith*).)

In *Smith*, the defendant was prosecuted under Florida law for operating as a private carrier under a contract with a business without having obtained the required license. (*Smith, supra*, 283 U.S. at pp. 556, 561.) At the preliminary hearing, the defendant contended the statute as applied to him violated the due process and equal protection clauses of the Fourteenth Amendment, but he was held over for trial. (*Id.* at p. 556.) The Supreme Court stated that, in general, when a statute valid upon its face requires a license as a precondition to carrying on a business, "one who is within the terms of the statute, but has failed to make the required application, is not at liberty to complain because of his anticipation of improper or invalid action in administration." (*Id.* at p. 562.) However, that rule does not apply "where a statute is invalid upon its face and an attempt is made to enforce its penalties in violation of constitutional right. In the present instance, the appellant has been arrested and held for trial. He is in jeopardy, and the state court, entertaining his application for discharge, has denied the constitutional right asserted. The question of the validity of the statute, upon which the prosecution is based, is necessarily presented." (*Ibid.*)

The Supreme Court has consistently followed the rule it announced in *Smith* in cases challenging the constitutionality of other licensing schemes where enforcing the scheme violated the unlicensed defendant's First Amendment rights. (See *Shuttlesworth v. City of Birmingham* (1969) 394 U.S. 147, 151 [participating in parade without required permit].) The court explained the rule thusly: " 'It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.' (*Staub v.* [*City of Baxley* (1958)] 355 U.S. 313, 322.) And our decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license. 'The Constitution can hardly be thought to deny to one subjected to the restraints of such an ordinance the right to attack its constitutionality, because he has not yielded to its demands.' (*Jones v. Opelika* [(1942)] 316 U.S. 584, 602 (Stone, C.J., dissenting), adopted per curiam on rehearing, [(1943)] 319 U.S. 103, 104.)" (*Shuttlesworth,* at p. 151, fn. omitted.)

California courts have similarly held that a criminal defendant has standing to challenge the facial constitutionality of the licensing statute under which he or she is being prosecuted as violative of the First Amendment without having first sought a license. (See *Dillon v. Municipal Court* (1971) 4 Cal.3d 860, 866, fn. 6 [parade without permit]; *Burton v. Municipal Court* (1968) 68 Cal.2d 684, 688 [operation of movie theater without a permit].)

Recently, in *In re D.L., supra*, 93 Cal.App.5th 144, the Court of Appeal held that standing existed in a case similar to ours. In that case, the juvenile court found true, among other allegations, an allegation that the juvenile unlawfully possessed a loaded

8

firearm in violation of section 25850, subdivision (a). (*Id*. at p. 149.) On appeal, and after *Bruen* had been announced, the juvenile contended his adjudication had to be reversed because section 25850 incorporated the unconstitutional "good cause" licensing requirement. (*Id*. at pp. 161-162.) Like here, the People contended the juvenile lacked standing to raise the contention because he had never applied for a concealed carry license, and the exception to the standing rule was limited to the unique context of the First Amendment. (*Id*. at pp. 156, 160.)

The Court of Appeal concluded the juvenile had standing. He had standing "because he is challenging the *facial* constitutionality of a criminal statute under which he has been convicted." (*In re D.L., supra*, 93 Cal.App.5th at p. 156.) The court relied on *Smith* and the First Amendment cases' holdings that a criminal defendant need not apply for a permit under a law that facially violated the person's First Amendment rights before challenging the law's facial constitutionality. (*Id*. at pp. 158-160.) It also concluded that due to the Supreme Court's application of the rule in a non-First Amendment context in *Smith*, it could not conclude the rule was strictly limited to First Amendment licensing cases. (*Id*. at p. 160.) Dicta in *Bruen* and *Heller* favorably comparing the Second Amendment to the First Amendment suggested the court should take a more cautious view of the People's argument on the issue of standing. (*Ibid.*)

In *In re T.F.-G., supra*, 94 Cal.Ap.5th 893, the Court of Appeal relied on *In re D.L.* to find standing. A juvenile was charged with violating section 25850 and was found to be a ward of the court. (*Id*. at p. 902.) The People contended the juvenile did not have standing to challenge the statute's constitutionality because he had not applied for a license. (*Id*. at p. 912.) The Court of Appeal disagreed. Citing to *In re D.L.*, the court stated the juvenile was "challenging his wardship adjudication under a penal statute—an enforcement mechanism of the regulatory regime that he contends is unconstitutional." (*Id*. at p. 913.)

In *Miller, supra*, 94 Cal.App.5th 935, another case similar to ours, a panel of this court recognized that the exception to the standing rule requiring the defendant first to seek a license had been applied mostly in First Amendment cases, and it also recognized the holdings in *In re D.L.* and *Smith*. (*Miller,* at p. 942.) However, because the court would conclude that the Second Amendment allows a state to prohibit concealed carry whether or not the state has a licensing regime, it assumed without deciding that the defendant had standing to raise her constitutional claim on demurrer, and it denied her claim on the merits. (*Ibid.*)

We agree with our sister courts that defendants have standing in this instance to raise a facial constitutional challenge by demurrer against sections 25400 and 25850. They are being criminally prosecuted under statutes they claim are rendered unconstitutional on their face due to *Bruen's* invalidation of the licensing statute, section 26150. Sections 25400 and 25850 are the "enforcement mechanism[s] of the regulatory regime" they contend is unconstitutional and under which they now risk the loss of their liberty. (*In re T.F.-G, supra*, 94 Cal.App.5th at p. 913.) They thus have a concrete and actual beneficial interest in a justiciable controversy.

We recognize that almost all the cases allowing the facial challenge to proceed despite the party not having sought a permit arise in the context of the First Amendment. But in *Heller* and *Bruen*, the Supreme Court indicated that Second Amendment rights are entitled to an equal amount of protection. Reviewing historical sources to discern the meaning of the Second Amendment, the *Heller* court cited favorably to a 19th Century source, stating: " '[G]overnment is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms . . . . The clause is analogous to the one securing the freedom of speech and of the press.' " (*Heller, supra*, 554 U.S. at p. 618, quoting J. Pomeroy, An Introduction to the Constitutional Law of the United States § 239, pp. 152–153 (1868).)

Later in its opinion, the *Heller* court stated, "The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong headed views.  The Second Amendment is no different.  Like the First, it is the very *product* of an interest balancing by the people . . . .  And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  (*Heller, supra*, 554 U.S. at p. 635.)

The *Bruen* court explained that the historical tradition test it was applying to determine the scope of the Second Amendment was consistent with the test the court applied to restrictions on rights protected by the First Amendment.  The court stated, "This Second Amendment standard accords with how we protect other constitutional rights.  Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms.  [(*Heller, supra,* 554 U.S. at pp. 582, 595, 606, 618, 634-635.)]  In that context, '[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.'  [(*United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803, 816; see also *Philadelphia Newspapers, Inc. v. Hepps* (1986) 475 U.S. 767, 777.)]  In some cases, that burden includes showing whether the expressive conduct falls outside of the category of protected speech.  [(See *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.* (2003) 538 U.S. 600, 620, fn. 9.)]  And to carry that burden, the government must generally point to *historical* evidence about the reach of the First Amendment's protections.  [(See, *e.g.*, *United States v. Stevens* (2010) 559 U.S. 460, 468-471 [placing the burden on the government to show that a type of speech belongs to a 'historic and traditional categor[y]' of constitutionally unprotected speech 'long familiar to the bar'] (internal quotation marks omitted)).)]"  (*Bruen, supra*, 142 S.Ct. at p. 2130.)

11

*Bruen* concluded its historical analysis of New York's proper cause provision by aligning the Second Amendment with the First: "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' [Citation.] We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense." (*Bruen, supra*, 142 S.Ct. at p. 2156.)

We infer from the linkages the Supreme Court has drawn between the First and Second Amendments that extending First Amendment standing law to rights under the Second Amendment is not inconsistent with the Supreme Court's standing jurisprudence. Criminal prosecutions under laws that facially violate the Second Amendment offend a right the Supreme Court has declared is not a second-class right; it is a right that is above all other interests opposing it. With such a right at risk, a defendant in jeopardy of losing his or her liberty in violation of that right has standing to challenge the offending law facially without first applying for a required license.

The principal case relied on by the People in opposition, *United States v. Decastro* (2d Cir. 2012) 682 F.3d 160, does not convince us otherwise. In *Decastro*, the defendant was indicted for transporting firearms into his home state of New York which he had acquired outside that state, a violation of federal law. (*Decastro, supra*, 682 F.3d at pp. 161-162.) He moved to dismiss the indictment on the ground the federal statute facially violated his Second Amendment right to keep and bear arms under *Heller*, and that New York City's restrictive licensing requirements were tantamount to a ban. (*Id*. at p. 162.) The district court denied the motion and later found him guilty. (*Id*. at p. 163.) On appeal, the defendant contended the federal statute was facially unconstitutional under

12

the Second Amendment, and, when combined with New York City's licensing scheme, it was unconstitutional as applied to him because it made it practically impossible for him to secure a handgun for self-defense. (*Ibid*.)

Addressing the as-applied argument first, the court of appeal believed the premise of that argument was that New York's licensing scheme was itself unconstitutional. However, because the defendant had not applied for a license, he lacked standing to challenge the state's licensing laws. The court stated, " 'As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy' " except when applying for a license would have been a futile gesture. (*Decastro, supra*, 682 F.3d at p. 164.)

Unlike in the case before us, the *Decastro* defendant was bringing an as-applied challenge. Moreover, New York's licensing laws were not the enforcement mechanism for or had any relation to the federal regime under which he was being charged. As the court in *In re D.L.* stated, *Decastro* is distinguishable because the defendant there "could not have avoided the charge (transportation of firearms into New York from another state) by simply obtaining a license for possession." (*In re D.L., supra*, 93 Cal.App.5th at p. 161.)

Furthermore, the *Decastro* court then addressed the defendant's *facial* challenge to the federal statute on the merits and held the statute did not violate the Second Amendment. (*Id*., *supra*, 684 F.3d at pp. 168-169.) Our conclusion that defendants have standing to raise their facial challenge to the licensing scheme is not contrary to *Decastro*.

Similarly, we find the People's reliance on the trial court decision of *People v. Rodriguez* (2022) 76 Misc.3d 494 [171 N.Y.S.3d 802] unpersuasive. That court relied on *Decastro* to hold that the criminal defendant before it lacked standing to challenge the state's handgun licensing regime when he had not first applied for a license. (*Id*. at pp. 496-497.)

## III

### *Constitutionality and Severability*

State law generally prohibits carrying a handgun in public, whether the gun is concealed or carried openly, and whether the gun is loaded or unloaded. (§§ 25400, subd. (a) [concealed firearm in vehicle or on person]; 25850, subd. (a) [loaded firearm in public]; 26350, subd. (a) [unloaded and exposed handgun in public].) There are numerous statutory exceptions to these prohibitions, but if a law-abiding California citizen does not qualify for one of the exceptions, generally the citizen's only means for lawfully carrying a handgun in public for self-defense is to obtain a license to carry a concealed handgun under section 26150.[1] The restrictions imposed by sections 25400 and 25850 against carrying a concealed or loaded firearm in public do not apply to a person licensed to carry a concealed handgun. (§§ 25655, 26010.)

Before the trial court, defendants contended that *Bruen* rendered California's licensing scheme unconstitutional in at least two respects. First, they argued that *Bruen* rendered section 26150, the licensing statute, unconstitutional. *Bruen* declared unconstitutional the elements of "good cause" and, they asserted, "good moral character," two of the licensing requirements under section 26150 for obtaining a concealed carry license. Further, they argued that because section 26150 is unconstitutional, a person may not be prosecuted for violating it. The fact that the licensing statutes are phrased as defenses to the general prohibition did not matter because the general prohibition was unconstitutional.

---

[1] We recognize that a citizen may be licensed to openly carry a loaded handgun if, among other criteria, the citizen resides in a county that has a population of less than 200,000, but Sacramento County, the county where defendants committed their crimes, does not qualify. (§ 26150, subd. (b)(2).)

Second, defendants contended that section 26150's failure to define "good cause" and "good moral character" rendered the statute unconstitutional under *Bruen* as an unlawful prior restraint of Second Amendment rights because it gave licensing authorities near unbridled discretion to create whatever definition they pleased. This was particularly true because section 26150 states the licensing authority "may issue" a license. Defendants asserted that a permissible prior restraint under the Second Amendment must not grant a government agency discretion to grant or withhold a license.

Our colleagues in *Miller, supra*, 94 Cal.App.5th 935, recognized that defendants' arguments at least as to section 25400 were based on the flawed premise that section 25400's ban of concealed firearms was unconstitutional if it was not accompanied by a valid licensing scheme. (*Id*. at p. 943.) The nation has a long, historical tradition of banning concealed carry, and such bans were lawful so long as citizens were allowed to carry firearms openly. (*Id*. at p. 944; *Bruen, supra*, 142 S.Ct. at pp. 2146-2147, 2150.) *Bruen* did not address a licensing scheme's impact on potential criminal charges for carrying a firearm without a license. (*Miller*, at p. 945.) Rather, *Bruen* recognized that historically, if a state banned both open and concealed carry, it was the open carry prohibition that conflicted with the constitution and was void. (*Miller,* at p. 946; *Bruen,* at p. 2147; see *Nunn v. State* (1846) 1 Ga. 243, 251.)

This point was dispositive in *Miller*: "Whatever constitutional defects may currently exist elsewhere in California's multifaceted statutory scheme regulating firearms, section 25400 is not itself unconstitutional because of them. To the contrary, [the defendant's] arguments that California's licensing scheme is invalid, if meritorious, would suggest other statutes such as the open carry prohibitions in sections 25850 and 26350 are unconstitutional, but the concealed carry prohibitions in section 25400 would remain valid post-*Bruen* because California would effectively no longer ban open carry." (*Miller, supra*, 94 Cal.App.5th at p. 946.)

15

We prefer to address the constitutionality of the licensing regime rather than suggest the state's open carry laws might be unconstitutional. Although the People have argued that historically, states were allowed to regulate public carry so long as they did not bar public carry altogether, they have not conceded that prosecuting defendants under section 25400 might have to be conditioned on striking the state's open carry ban found in section 25850, which defendants were charged with violating (although their handgun was found inside a bag in a car). We presume the Legislature would prefer to preserve if possible the concealed carry regime without putting the open carry ban at more constitutional risk than it might already be facing.[2] We thus turn our attention to section 26150, the concealed carry licensing statute, to determine if its good cause and good moral character provisions and the discretion it vests in licensing authorities facially survive *Bruen* and whether any unconstitutional provisions can be severed.

A.    *Bruen*

*Bruen* arose in New York where the petitioners, law-abiding citizens, unsuccessfully applied for licenses to carry handguns in public for self-defense. New York law prohibited possessing any firearm inside or outside the home without a license. To obtain an unrestricted license to carry a firearm outside the home, the applicant had to prove that "proper cause" existed to issue it. (*Bruen, supra*, 142 S.Ct. at pp. 2122-2125.) New York courts defined proper cause as a special need for self-protection distinguishable from the general community. (*Id*. at p. 2123.) The petitioners were unable to make that showing.

---

**2**    See *Baird v. Bonta* (9th Cir. Sept. 7, 2023) 81 F.4th 1036. Plaintiffs in that action, residents of counties with less than 200,000 population, sought licenses to open carry. The court of appeals reversed the district court's denial of plaintiffs' motion for a preliminary injunction and directed the district court to consider whether plaintiffs were likely to succeed on the merits.

The Supreme Court first explained the test for determining whether a firearms regulation offends the Second Amendment. The Second Amendment presumptively protects conduct the Amendment's plain text covers. (*Bruen, supra*, 142 S.Ct. at p. 2126.) To justify a firearms regulation, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Ibid*.)

To make that determination, courts will have to reason by analogy and determine whether a historical regulation and a modern regulation are " 'relevantly similar.' " (*Bruen, supra*, 142 S.Ct. at p. 2132.) Relevant similarity will depend on "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense . . . [as] 'individual self-defense is "the central component" of the Second Amendment right.' " (*Id*. at pp. 2132-2133; italics omitted.)

"To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.' [Citation.] On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (*Bruen, supra*, 142 S.Ct. at p. 2133.)

Applying this test, the Supreme Court held New York's "proper cause" requirement to be unconstitutional. After finding that the Second Amendment guaranteed a general right to public carry, and after performing an extensive historical analysis, the court stated: "[W]e conclude that respondents [New York] have not met their burden to

17

identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. [(*Heller*, 554 U.S. at p. 581.)] Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public." (*Bruen, supra*, 142 S.Ct. at p. 2156.)

B. "Good cause" provision

The *Bruen* court made clear that California's similar "good cause" requirement in section 26150 was unconstitutional. (*Bruen, supra*, 142 S.Ct. at p. 2124 & fn. 2.) On June 24, 2022, the day after *Bruen* was released, the California Attorney General issued a legal alert recognizing that the good cause requirement in sections 26150 and 26155 was no longer constitutional. (Legal Alert OAG-2022-02 (ca.gov) (https://perma.cc/F2MJ-SXZ2) [accessed Nov. 13, 2023].) The alert instructed local officials not to require proof of good cause for issuing a public-carry license effective immediately. (*Ibid.*) Officials were directed to continue to apply the other licensing requirements, including proof of "good moral character." (*Ibid.*)

Because the good cause requirement of section 26150 is unconstitutional, we must determine whether that requirement can constitutionally be severed from the remainder of the statute. In the absence of express language confirming or prohibiting severability, such as the case here, an unconstitutional statute remains effective to the extent its invalid

18

portions can be severed from any valid portions. (*Hotel Employees and Restaurant Employees Intern. Union v. Davis* (1999) 21 Cal.4th 585, 613.) An invalid portion can be severed "if, and only if, it is 'grammatically, functionally and volitionally separable.' " (*Ibid*.; *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 270-271.)

Grammatical separability "depends on whether the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains." (*Matosantos, supra*, 53 Cal.4th at p. 271.) Functional separability "depends on whether 'the remainder of the statute " 'is complete in itself . . . .' " ' " (*Ibid*.) Volitional separability "depends on whether the remainder ' "would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute." ' " (*Ibid*.)

Defendants contended at the trial court that the offending portions of section 26150 could not be severed. They asserted *Bruen* rendered unconstitutional the "good cause" provision, the "good moral character" provision, and the "may issue" language allegedly vesting unbridled discretion in the licensing authorities. Severing those three provisions, they argued, left a statute that contained no restriction on the executive branch and did not make grammatical sense. We agree with the People and the holding in *In re D.L., supra*, 93 Cal.App.5th at pages 163-165, that the good cause provision is severable. The provision is grammatically separable. It is contained in a discrete subdivision, subdivision (a)(2) of section 26150. Excising the subdivision does not impair the wording or coherence of the remaining provisions in subdivision (a). (*Id*. at p. 163.)

The good cause provision is functionally separable. The remaining provisions are complete in themselves and can be applied independently. They require an applicant to be of good moral character, to reside or work within the city or county where the license is being issued, and to have completed a firearm safety course. (§ 26150, subd. (a); *In re D.L., supra*, 93 Cal.App.5th at p. 163.)

The good cause provision is also volitionally separable. In 2010, when the Legislature replaced former section 12050 with section 26150, it "included the same

19

general requirements for obtaining a license to carry a concealed weapon, which had been in former section 12050, without substantive change, but 'reorganize[d]' them from a single paragraph into distinct paragraphs.  [(Stats. 2010, ch. 711, § 6.)]  This reorganization illustrates that the Legislature viewed the requirements as separate, and as functioning independently of one another."  (*In re D.L., supra*, 93 Cal.App.5th at p. 164.)

      C.     <u>"Good moral character"</u> provision

Even if the good cause provision is severable, defendants asserted on demurrer that the "good moral character" element was also unlawful under *Bruen* and not severable.  Defendants argued that the historical analogical analysis performed by the Supreme Court in *Bruen* demonstrated there was no historical analogue for "California's scheme."  *Bruen*, however, did not address an element comparable to good moral character.  Its analogical analysis and its holding were focused on reviewing New York's proper cause requirement.  (*Bruen, supra*, 142 S.Ct. at pp. 2135, 2156.)  The court found that American governments from the time of the Colonies through the adoption of the Second and Fourteenth Amendments generally did not broadly prohibit public carry of commonly used firearms for personal self-defense.  (*Id*. at pp. 2142-2153, 2156.)  It also found that American governments generally did not require "law-abiding, responsible citizens" to show a special need for self-protection.  (*Id*. at p. 2156.)  The court, however, made no finding on whether American governments traditionally limited public carry to persons of "good moral character" or, if they did, whether such a finding was discretionary or subject to objective factors.  In fact, New York's licensing scheme for a license to possess a firearm at home, a different license than that sought by the *Bruen* petitioners, required the applicant to show he was of "good moral character," but the *Bruen* court did not address that element.  (*Id*. at pp. 2122-2123.)  It does not provide the necessary historical analysis to determine the validity of the good moral character requirement.

20

Nonetheless, defendants correctly argued that *Bruen* established the test for determining whether a firearms regulation such as the good moral character clause violates the Second Amendment. (*Bruen, supra*, 142 S.Ct. at p. 2126.) Neither the People in opposing defendants' demurrer nor the trial court engaged in the historical analysis required by *Bruen* to determine the constitutional validity of the good moral character clause. Instead, the People argued the element remained constitutional because (1) *Bruen* did not disturb New York's moral character element; (2) *Bruen* cited Connecticut's, Delaware's, and Rhode Island's "may issue" licensing schemes with suitability requirements as examples of schemes that do not grant licensing officials unfettered discretion; (3) a pre-*Bruen* District of Columbia appellate decision (not the D.C. Circuit) upheld a suitability requirement; and (4) certain local California agencies had developed objective and definite standards for defining good moral character. The People make similar arguments before us.

None of these arguments establish that discretionary statutory authority to deny a handgun license based on the applicant's good moral character is consistent with the nation's historical tradition of firearm regulation. The *Bruen* court's silence about New York's good moral character clause cannot be interpreted as assent. New York's clause was not placed in issue, as the petitioners in *Bruen* sought a license under a different regime that, as far as the opinion discloses, did not include a good moral character clause. (*Bruen, supra*, 142 S.Ct. at pp. 2122-2123, 2125.)

However, rather than remand for the People and the trial court to conduct this analysis, we will assume for purposes of argument only that the good moral character provision is not consistent with the nation's historical tradition of firearm regulation and is unconstitutional. In that case, the question before us becomes whether the clause is severable from the remainder of section 26150. We conclude it is, for the same reasons the good cause provision is grammatically, functionally, and volitionally separable. It is contained in a discrete subdivision, subdivision (a)(1) of section 26150; the remaining

21

provisions can be applied independently; and the Legislature evidenced its intent that the clause be separable.  (See *In re D.L., supra*, 93 Cal.App.5th at pp. 163-165.)

        D.       <u>"May issue" Clause</u>

Defendants further argued in their demurrer that section 26150's failure to define "good moral character" rendered the law unconstitutional under *Bruen* because local officials had unbridled discretion to define the term how they pleased.  Their discretion also arose from the statute's stating that a licensing official "may issue" a license if the listed criteria are met, including the establishment of a good moral character.  (§ 26150, subd. (a).)

The trial court determined that *Bruen* invalidated the entire licensing scheme by holding as unconstitutional public carry licensing schemes that relied on the government's exercise of discretion to issue the license.  These schemes stated the government "may issue" a license as opposed to "shall issue" upon proof of narrow, objective factors.  The trial court held that the "may issue" language in section 26150 was at the statute's heart and was not severable from the remainder of the statute.

Defendants and the trial court misread the holding in *Bruen*.  The *Bruen* court based its holding on the "proper cause" language in the New York statute, not on that statute's use of the phrase "may issue" or the discretionary nature of the licensing scheme.  (*Bruen, supra*, 142 S.Ct. at pp. 2138, 2156; *In re D.L., supra*, 93 Cal.App.5th at p. 166.)  The court said as much in a footnote.  The dissent had argued that the court could not determine the New York statute's constitutionality without reviewing evidence of how much discretion the licensing authorities possessed or how they had exercised their discretion.  (*Bruen*, at p. 2135, fn. 8.)  The majority disagreed and stated that issue was not relevant to its holding:  "The dissent does not dispute that any applicant for an unrestricted concealed-carry license in New York can satisfy the proper-cause standard only if he has ' " 'a special need for self-protection distinguishable from that of the

22

general community.' " ' [Citation.] And in light of the text of the Second Amendment, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense. [Citation.] That conclusion does not depend upon any of the factual questions raised by the dissent. [Petitioners] allege that they were denied unrestricted licenses because they had not 'demonstrate[d] a special need for self-defense that distinguished [them] from the general public.' [Citation.] If those allegations are proven true, then it simply does not matter whether licensing officers have applied the proper-cause standard differently to other concealed-carry license applicants; [petitioners'] constitutional rights to bear arms in public for self-defense were still violated." (*Ibid*.)

It is true the Supreme Court commented on the discretionary nature of New York's licensing law. It stated that 43 states are "shall issue" jurisdictions, where licensing authorities "must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." (*Bruen, supra*, 142 S.Ct. at p. 2123, fn. omitted.) In comparison, New York, California, and five other jurisdictions have "may issue" licensing laws under which authorities have discretion to deny concealed-carry licenses "even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." (*Id*. at p. 2124.)

The *Bruen* majority, however, did not hold that such "may issue" laws are *facially* unconstitutional. In providing examples of acceptable "shall issue" licensing laws, the court showed that the mere use of the terms "may issue" in a licensing law did not automatically grant the licensing authorities unconstitutional discretion over issuing licenses, including when the statutes required a showing of good moral character or

23

suitability. Whether a "may issue" regime operated as a "shall issue" regime was an issue for an as-applied challenge, not a facial challenge.

Specifically, the Supreme Court recognized that three states—Connecticut, Delaware, and Rhode Island—have discretionary criteria similar to California's good moral character requirement "but *appear to operate* like 'shall issue' jurisdictions." (*Bruen, supra*, 142 S.Ct. at p. 2123, fn. 1, italics added.) Connecticut's licensing statute at the time *Bruen* was decided stated the licensing authority "may issue a temporary state permit" upon finding the applicant is a "suitable person." (Conn. Gen. Stat. § 29-28(b) (2021) [2016 Conn. Legis. Serv. P.A. 16-34].) This suitable person standard precluded permits "only to those 'individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon.' (*Dwyer v. Farrell* [(1984) 193 Conn. 7, 12 [].)]" (*Bruen, supra*, 142 S.Ct. at p. 2123, fn. 1.)

Delaware's licensing statute states a person of "good moral character" "may be licensed" when conditions are met. (Del. Code Ann. tit. 11, § 1441(a).) Ultimate approval is left to the superior court who "may or may not, in its discretion, approve any application." (Del. Code Ann. tit. 11, § 1441(d).) The *Bruen* court noted that as of the date of its opinion, Delaware had "thus far processed 5,680 license applications and renewals in fiscal year 2022 and has denied only 112. [(See Del. Courts, Super. Ct., Carrying Concealed Deadly Weapon (June 9, 2022), https://courts.delaware.gov/forms/download.aspx?ID=125408.)] Moreover, Delaware appears to have no licensing requirement for open carry." (*Bruen, supra*, 142 S.Ct. at p. 2123, fn. 1.)

Rhode Island's licensing statute states the licensing authorities "shall . . . issue" a concealed carry license upon finding the applicant is a "suitable person" to be licensed. (R. I. Gen. Laws § 11–47–11(a).) The Supreme Court emphasized that the demonstration of a proper showing of need is not a requirement of Rhode Island's statute. (*Bruen, supra*, 142 S.Ct. at p. 2123, fn. 1.)

The *Bruen* court's citation to these statutes as "shall issue" statutes demonstrated the court was not facially condemning licensing schemes based solely on their use of "may issue" language or the exercise of discretion.  The court's language that these jurisdictions "appear to operate like 'shall-issue' jurisdictions" indicates that, unless it can be determined from the face of the provision, whether a licensing scheme vests an amount of discretion in licensing authorities that exceeds what the Second Amendment allows is an issue best decided in as-applied challenges, not facial challenges.  This is because the argument of whether discretion was unlawfully exercised would not apply in all circumstances.  (*In re D.L., supra*, 93 Cal.App.5th at p. 166.)

Defendants, of course, could not have raised an as-applied challenge on demurrer. (*Tobe v. City of Santa Ana, supra*, 9 Cal.4th at p. 1085.)  The trial court thus erred in finding on demurrer that *Bruen* invalidated section 26150 based on the statute's vesting of discretion in licensing authorities under the "may issue" language.

Defendants did not challenge the remaining concealed carry licensing requirements.  Those requirements advance California's long-held goals of "ensuring Californians who carry firearms are responsible and law-abiding, live in or have substantial contact with the licensing jurisdiction (since local law enforcement is tasked with licensee compliance), and know how to safely handle a gun."  (*In re D.L., supra*, 93 Cal.App.5th at p. 166.)  The *Bruen* court noted that "nothing" in its analysis casts doubt on the constitutionality of licensing regimes that required applicants to "undergo a background check or pass a firearms safety course" as a condition for carrying firearms in public.  (*Bruen, supra*, 142 S.Ct. at p. 2138, fn. 9.)

Because section 26150's "good cause" and "good moral character" requirements are severable, and because *Bruen* did not facially invalidate the statute's "may issue" provision, section 26150 does not facially violate the Second Amendment.  Since the statute is a valid licensing provision and provides a valid means for citizens to exercise their right under *Bruen* to possess a handgun in public for self-defense, defendants'

Second Amendment rights are not violated when the state enforces that provision criminally.

## DISPOSITION

The judgment is reversed, and the trial court is directed to overrule defendants' demurrers.

_____

HULL, J.

We concur:

_____

EARL, P. J.

_____

MESIWALA, J.